## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

DIANA RICHARDSON,  :
                              :    CIVIL ACTION
    Plaintiff,        :
                              :
    v.                :
                              :    NO. 2009-136
VIRGIN ISLANDS PORT AUTHORITY,  :
                              :
    Defendant.        :

RECEIVED
2010 APR 21 PM 5:07
CLERK OF THE
DISTRICT COURT
ST. THOMAS

## MEMORANDUM

BUCKWALTER, S. J.                                      April 21, 2010

    Currently pending before the Court is the Motion of Defendant Virgin Islands Port Authority ("VIPA") to Stay Proceedings Pending Arbitration. For the following reasons, the Motion is granted and this action is stayed pending resolution of the arbitration.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

    According to the facts set forth in the Complaint, Plaintiff Diana Richardson was employed by Defendant VIPA in August 2006, as the Property Manager for Crown Bay Center, a 60,000 square foot facility featuring retail and commercial stores. (Compl. ¶ 4.) In October 2006, Defendant hired Charles Martin in the position of Operations Manager for Crown Bay Center to work as Plaintiff's immediate subordinate. (Id. ¶ 5.) From the outset, Martin refused to take direction from Plaintiff and made inappropriate and harassing comments towards her regarding her weight and her sexual activity. (Id. ¶¶ 7-8.)

    In August 2007, Plaintiff informed Executive Director Darlan Brin of Martin's harassment and insubordination. (Id. ¶ 10.) Although VIPA had been previously been made aware of Brin's own harassing tendencies, it never took any investigatory, training, or disciplinary action against him. (Id.) Brin directed Human Resources to look into the improper comments and indicated the he

would himself investigate the insubordination. (Id. ¶ 11.) He never undertook any such investigation. (Id.) Human Resources confirmed the statements from several witnesses, but concluded that no sexual harassment had occurred. (Id. ¶ 13.) Although it recommended that a meeting be held with Plaintiff, Brin, and Martin, Brin refused to hold this meeting and Martin continued his rudeness and insubordination. (Id. ¶¶ 14-15.) In November 2007, Brin sent out a memo indicating that Martin would no longer report to Plaintiff. (Id. ¶ 16.) Shortly thereafter, in January 2008, a new memo from Brin indicated that Martin would return to reporting to Plaintiff. (Id. ¶ 17.)

The following month, Brin was removed as Executive Director of VIPA and replaced by Ken Hobson.[1] (Id. ¶ 18.) Immediately, Plaintiff met with Hobson to explain the continuing harassment and insubordination by Martin, but Hobson took the position that Plaintiff's complaints were "personal." (Id. ¶ 19.) From February to July 2008, the tension between Plaintiff and Martin increased to the point that he openly refused to accept job assignments and became increasingly rude. (Id. ¶ 21.) Plaintiff's department, in turn, refused to take instructions from Martin due to his conduct towards Plaintiff. (Id. ¶ 23.) Plaintiff called a department meeting and instructed her employees to work together as a team, at which time two employees informed her that Martin had been making sexually derogatory comments behind her back. (Id. ¶¶ 24-26.) Plaintiff reported this behavior to Hobson, who, in turn, appointed another VIPA employee, Joseph Cranston, and the Chief of VIPA Police, O'Neal Moolenaar, to investigate. (Id. ¶¶ 27-28.)

On October 1, 2008, Plaintiff repeated her complaints about Martin to Hobson, who told Plaintiff that she needed to be more forgiving. (Id. ¶ 31.) On October 8, 2008, Plaintiff attended a

---

[1] The Complaint actually states that Brin was removed in February 2007. (Id. ¶ 18.) Based on the surrounding context of this allegation, the Court assumes that this is a typographical error and that Brin was actually removed in February 2008.

meeting with Joseph Cranston, at which time he remarked that, during his investigation, the employees repeated Martin's sexually harassing statements. (Id. ¶ 30.) Nonetheless, Plaintiff was informed that because both she and Martin were doing a good job, neither would be disciplined if Plaintiff stopped the investigation. (Id. ¶ 33.) Plaintiff refused. (Id.)

On December 1, 2008, Hobson called a meeting with Plaintiff and Martin to discuss some allegations of fabricated overtime that Martin had made against Ronald Maynard – one of the employees who had given information about Martin. (Id. ¶ 35.) At that meeting, Hobson demanded to know what Plaintiff had done about the allegations Martin had made against Maynard. (Id. ¶ 36.) Plaintiff explained that she had met with Maynard, but took no disciplinary action against him as there was no substantiation of Martin's complaints. (Id.) Upon completion of this explanation, Hobson ordered Plaintiff to inform all employees that "[i]f they disrespect you Mr. Martin as their manager, or Ms. Lambertis[2] as a lady, they will be immediately terminated." (Id. ¶ 38.) Plaintiff then stated that she too was a lady, at which point Martin openly snickered. (Id.). When Plaintiff indicated that the snicker was open subordination, Hobson responded that there were no witnesses and that there would be no action taken for the history of harassment and insubordination, as Plaintiff had never documented her complaints. (Id. ¶ 39.) Subsequently, Plaintiff was informed by VIPA that because she had hired counsel, the VIPA board would take no further action on her complaints against Martin. (Id. ¶ 40.)

On the morning of December 19, 2008, at 10:00 a.m., Hobson informed Plaintiff, in the presence of other employees, that Martin would no longer report to her, effective December 22, 2008. (Id. ¶ 42.) When Plaintiff inquired into finding a replacement, Hobson said she would have no replacement and would be responsible for both her and Martin's duties. (Id. ¶ 43.) Plaintiff

---

[2] The Complaint does not indicate who Ms. Lambertis is.

immediately returned to her office and prepared correspondence to the board regarding her concerns. (Id. ¶ 45.) Plaintiff then spoke directly to Martin to see if he would be working the next day so she could retrieve his keys, identification, and telephone. (Id. ¶ 47.) Martin refused to hand over the items and said he would not be coming in the following day. (Id. ¶ 48.) He then told Plaintiff that he was sick of "her f—in harassment" and stated, "I will knock that child out of you." (Id. ¶ 49.) He proceeded to hit the pregnant Plaintiff in her side. (Id.) Plaintiff immediately reported the assault and battery to VIPA police, who sent a male and female officer to the scene, one who spoke with Martin and one took Plaintiff to the hospital. (Id. ¶ 50.)

Plaintiff called Hobson on December 20, 2008 to report the incident, but since he was getting on a plane, he directed Plaintiff to call Dale Gregory as Acting Executive Director of VIPA. (Id. ¶ 52.) She subsequently spoke with Gregory, who represented that he would look into the matter. (Id. ¶ 53.) VIPA's attorney sent Plaintiff a letter in January 2009, indicating that there would be a hearing of the personnel committee to discuss the incident. (Id. ¶ 54.) Although Plaintiff requested an alternate date so her counsel could attend, her request was refused. (Id. ¶ 55.) The meeting was held on January 14, 2009, and Plaintiff indicated that she would not sit in the same room as Martin. (Id. ¶ 56.) She was told she could leave and VIPA continued the hearing without her. (Id. ¶ 57.)

On January 18, 2009, Plaintiff received an e-mail from Hobson's assistant stating that Plaintiff was no longer to attend staff meetings. (Id. ¶ 58.) On February 27, 2009, Plaintiff received a letter from the VIPA board stating that no action would be taken on her complaints as there was insufficient evidence of her claims. (Id. ¶ 59.)

Plaintiff had previously submitted a request for an evaluation and salary increase per her contract in December 2008. (Id. ¶ 60.) In July 2009, VIPA represented to the Equal Employment Opportunity Commission ("EEOC") that her salary increase was in process and she would receive

it. (Id. ¶ 61.) As of August 31, 2009, Defendant still had not provided Plaintiff with the salary increase. (Id. ¶ 62.)

After obtaining a right to sue letter from the EEOC, Plaintiff filed the present Complaint on September 21, 2009. The Complaint alleges five Counts as follows: (1) wrongful discharge[3] in violation of 24 V.I.C. § 76; (2) violation of Titles 10 (civil rights) and 24 (fair labor standards) of the Virgin Islands Code or public policy of the Virgin Islands; (3) breach of the duty of good faith and fair dealing; (4) assault and battery; and (5) intentional infliction of emotional distress. (Compl. ¶¶ 64-78.) On November 24, 2009, Defendant filed a Motion to Dismiss and Plaintiff responded on December 14, 2009. Subsequently, on February 8, 2010, Defendant filed a Motion to Stay Proceedings Pending Arbitration, Plaintiff responded, and Defendant filed a Reply Brief. The Court now turns to the merits of this latter motion.

## II. STANDARD OF REVIEW

When ruling on a motion to compel arbitration under the FAA, a court may not consider the merits of the underlying claims. Great W. Mortgage Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997). Rather, the court may only determine whether the merits of the case should be arbitrated or litigated. Id. The standard for determining whether a genuine issue of material fact exists regarding the existence of an agreement to arbitrate is "quickly recognized as the standard used by district courts in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c)." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 159 n.3 (3d Cir. 2009) (quoting Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 n.9 (3d Cir. 1980)). "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." Par-Knit Mills, 636 F.2d at 54.

---

[3] There is no indication in the Complaint that Plaintiff either was terminated or voluntarily left her position.

The party opposing the motion receives "the benefit of all reasonable doubts and inferences that may arise." Id. However, once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III. DISCUSSION

At issue in the pending case is whether Plaintiff's Complaint must be arbitrated pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (1947). Defendant asserts that, upon accepting the position of Property Manger of VIPA's Crown Bay Commercial Center, Plaintiff entered into a Management Agreement (the "Management Agreement" or the "Agreement"), which contained the following arbitration provision:

> Except for a claim for equitable relief, any controversy, dispute or claim arising out of or relating to this Agreement, or its interpretation, application, implementation, breach or enforcement which the parties are unable to resolve by mutual agreement, shall be settled by submission by either party of the controversy, claim or dispute to binding arbitration in the United States Virgin Islands, Judicial District of St. Thomas and St. John (unless the parties agree in writing to a different location), in accordance with the rules of the American Arbitration Association then in effect. In any such arbitration proceeding the parties agree to provide all discovery deemed necessary by the arbitrator(s). The decision and award made by the arbitrators shall be final, binding and conclusive on all parties hereto for all purposes, and judgment may be entered thereon in any court having jurisdiction thereof.

(Def.'s Mot. to Stay, Ex. 1 ("Agreement") ¶ 17.) Given this contractual obligation, Defendant now contends that all of Plaintiff's current claims must be submitted to binding arbitration.

Section 2 of the Federal Arbitration Act ("FAA") provides that arbitration agreements "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985). "The purpose of the Act was to abolish the common law rule that arbitration agreements were not judicially

enforceable." Id.. The FAA, therefore, "preempts state law that might 'undercut the enforceability of arbitration agreements.'" Id. (quoting Southland Corp. v. Keating, 465 U.S. 1, 16 (1984)).

Under the FAA, "so long as an independent basis of federal jurisdiction exists, a party to a contract may petition the federal courts for an order compelling arbitration if the other party breaches an arbitration clause." Central Reserve Life Ins. Co. v. Marello, No. CIV.A.00-3344, 2000 WL 1474106, at *2 (E.D. Pa. Oct. 4, 2000) (citing 9 U.S.C. § 4) (internal footnote omitted), aff'd, 281 F.3d 219 (3d Cir. 2001), cert. denied, 537 U.S. 819 (2002). Filing a lawsuit based on arbitrable claims constitutes such a breach. Id. The FAA evidences a strong federal policy in favor of resolving disputes through arbitration. Century Indem. Co. v. Certain Underwriters at Lloyd's London, 584 F.3d 513, 522 (3d Cir. 2009). Therefore, any doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of finding coverage. Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 55 (3d Cir. 2001). Indeed, if there is a way to interpret the arbitration clause so as to encompass the disputed issue, the FAA provides that courts should compel arbitration. Smith v. The Equitable, 27 F. Supp. 2d 565, 568 (E.D. Pa. 1998).

Nonetheless, a court cannot order the arbitration of any claim unless the parties to a dispute have agreed to arbitration. Id. at 54. In this sense, the FAA recognizes that arbitration is a matter of contract which cannot be forced upon a party that has not agreed in advance to submit their grievances to arbitration. AT&T Tech., Inc. v. Comme'n Workers of Am., 475 U.S. 643, 648-49 (1986). Thus, "when adjudicating a motion to compel arbitration, the court must specifically address two issues: (1) whether the parties have entered into a valid written agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement." Gomery v. Versatile Mobile Sys. (Canada), Inc., No. CIV.A.07-2292, 2009 WL 159200, at *3 (M.D. Pa. Jan. 22, 2009) (citing Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 202 (3d Cir. 2001); 9 U.S.C.

7

§ 2 (addressing the validity, irrevocability, and enforcement of written agreements to arbitrate)). "Absent language in the parties' agreement clearly providing otherwise, the arbitrability of a dispute is a question of law for the court to determine." Gomery, 2009 WL 159200, at *3 (citing U.S. Small Bus. Admin. v. Chimicles, 447 F.3d 207, 209 (3d Cir. 2006); Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 154 (3d Cir. 2001)). The reviewing court must apply federal substantive law to determine whether an issue governed by the FAA is referable to arbitration, but the court may apply state law when assessing issues of contract formation and defenses to enforcement. Gay v. CreditInform, 511 F.3d 369, 387 (3d Cir. 2007) (citing cases); see also Harris v. Green Tree Fin. Corp., 183 F.3d 173, 178 (3d Cir. 1999).

In the case at bar, Plaintiff alleges that several material issues of fact exist regarding the validity and scope of the arbitration provision of the Management Agreement, which bar its enforcement. Specifically, she contends that: (1) the arbitration provision is not a valid agreement to arbitrate; (2) the employment discrimination claims do not fall within the scope of the arbitration agreement; (3) the arbitration agreement is both procedurally and substantively unconscionable; and (4) the Defendant effectively revoked the agreement to arbitrate by treating Plaintiff as a regular VIPA employee. The Court addresses each argument individually.

A.     **Whether the Management Agreement Evidences a Valid, Written Agreement to Arbitrate**

As noted above, "[f]or a court to compel arbitration, it initially must find that there is a valid agreement to arbitrate because the basis for contractual arbitration is consent, not coercion." Century Indem. Co., 584 F.3d at 523 (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995)). "To determine whether the parties have agreed to arbitrate, we apply 'ordinary state-law principles that govern the formation of contracts.'" Id. (quoting First Options of Chicago,

Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

Plaintiff's first claim that there is no valid, written agreement to arbitrate is three-fold. First she contends that under both federal law and state law, a waiver of an employee's right to trial by jury, which is a fundamental right, must be knowing and voluntary. (Pl.'s Resp. Mot. to Stay 8 (citing Malone v. Bechtel, Inc., No. CIV.A.01-142, 2002 WL 84601, at *1-2 (D.V.I. Jan. 22, 2002) and 5 V.I.C. § 815).) Second, Plaintiff argues that Defendant has failed to produce sufficient evidence to establish that Plaintiff voluntarily agreed to arbitrate a federal employment discrimination claims against VIPA. (Pl.'s Resp. Mot. to Stay 9.) Absent, "mutual assent," a contract between the parties regarding arbitration could not exist. (Id. at 9-10.) Finally, Plaintiff asserts that even if the Court were to find that Defendant produced some evidence of a valid agreement, there is sufficient contrary evidence that an arbitration agreement did not exist and, as such, the Court should allow pre-arbitration discovery on this issue. The Court considers each point in turn.

## 1.    Knowing and Voluntary Waiver of Right to a Jury Trial

Plaintiff first contends that the Seventh Amendment right to a jury trial is fundamental and waiver of its protection can only be knowing and voluntary. This standard is codified by Virgin Islands statutory law, which expressly states that, "[a]n agreement that waives a right guaranteed by the Constitution of the United States, is unenforceable, unless the waiver of the right is agreed to knowingly and voluntarily." 5 V.I.C. § 815 (2007). Because the record in this case reveals no evidence to establish that Plaintiff knowingly and voluntarily agreed to arbitrate and, thus, surrender her right to a jury trial, Plaintiff claims that the Court cannot find a valid agreement to arbitrate. (Pl.'s Resp. Mot. to Stay 9-10.)

Plaintiff's argument, however, is easily dispensed with under both Third Circuit and Virgin

9

Islands law. The Third Circuit, in <u>Seus v. John Nuveen & Co., Inc.</u>, 146 F.3d 175, 183-84 (3d Cir. 1998), <u>overruled on other grounds by</u>, <u>Green Tree Fin. Corp. AL v. Randolph</u>, 531 U.S. 79 (2000), held that the "knowing and voluntary" standard was not a generally applicable principle of contract law and did not apply to determine the validity of an arbitration agreement. <u>Id.</u> at 183. The court went on to conclude that "[n]othing short of a showing of fraud, duress, mistake or some other ground recognized by the law applicable to contracts generally" would excuse the district court from enforcing the arbitration agreement. <u>Id.</u> at 184. The Third Circuit reaffirmed this principle in <u>Morales v. Sun Contractors, Inc.</u>, 541 F.3d 218 (3d Cir. 2008), and held that "applying a heightened 'knowing and voluntary' standard to arbitration agreements would be inconsistent with the FAA." <u>Id.</u> at 224. It also reiterated that absent a showing of fraud or duress, a party is bound by an arbitration clause to which he or she manifested assent.[4] <u>Id.</u>

In the present matter, Plaintiff does not claim that she entered the Agreement under fraud, duress, mistake, or some other ground recognized by the law applicable to contracts generally. Nor does she dispute that she voluntarily signed the Agreement as part of her accepting employment with Defendant. Rather, she simply argues that (a) VIPA's counsel failed to inform her that she should consult an attorney to review the Agreement and (b) asked her to expedite the signing of the

---

[4] Consistently, cases arising within the Third Circuit have held that nothing in either the United States Constitution or 5 V.I.C. § 815 permits the application of a knowing and voluntary waiver standard to determine the validity of an arbitration agreements. <u>See, e.g.</u>, <u>Belgrave v. Wyatt V.I., Inc.</u>, No. CIV.A.07-084, 2010 WL 724412, at *2 (D.V.I. Mar. 1, 2010) (rejecting plaintiff's attempt to avoid an arbitration clause in his employment contract by arguing that "he did not 'knowingly and voluntarily' waive his constitutional right to a jury trial); <u>Cannonier v. Turner Intern., L.L.C.</u>, No. CIV.A.07-0492010 WL 697351, at *2-3 (D.V.I. Feb. 25, 2010) (reaffirming that the "knowing and voluntary" standard was inapplicable to determine the validity of an arbitration agreement and finding that 5 V.I.C. § 815 may not be applied to arbitration agreements); <u>Marotta v. Toll Bros., Inc.</u>, No. CIV.A.99-2328, 2010 WL 744174, at *6 (E.D. Pa. Mar. 3, 2010) (rejecting a heightened "knowingly and willfully" standard for arbitration agreements and holding that only a generally applicable principle of contract law, such as fraud or duress, may make an arbitration agreement unenforceable).

Agreement in order to start her employment. (Pl.'s Resp. Mot. to Stay, Aff. of Diana Richardson ("Richardson Aff.") ¶¶ 6-7, Mar. 5, 2010.) In turn, Plaintiff claims that she "was not aware of the Arbitration Clause in the Agreement" and "was not aware . . . that she was giving up [her] right to a jury trial for employment disputes." (Id. ¶¶ 8-9.) Under unequivocal Third Circuit precedent,[5] this knowing and voluntary standard is clearly inapplicable to our inquiry. As such, Plaintiff's first argument is an insufficient basis on which to deem the arbitration agreement unenforceable.

### 2.   Mutual Assent

In what appears to be merely a semantic twist on the same argument, Plaintiff contends that the Agreement is not supported by "mutual assent" since there was no meeting of the minds. Under the Restatement (Second) of Contracts, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'" Univ. of V.I. v. Petersen-Springer, 232 F. Supp. 2d 462, 469 (D.V.I. 2002) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981)), appeal dismissed 90 Fed Appx. 436 (3d Cir. 2003). However, while mutual asset is often rephrased as a "meeting of the minds," "[a]cceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent." Morales, 541 F.3d at 221. A party's signature is a clear manifestation of that intent. Id. As observed by the United States Supreme Court, "[i]t will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." Upton v. Tribilcock, 91 U.S. 45, 50 (1875), cited in Morales, 541 F.3d at 221.

---

[5] Plaintiff relies heavily on a Sixth Circuit case's discussion of the test for determining whether a plaintiff has knowingly and voluntarily waived his or her right to pursue employment claims in federal court. (Pl.'s Resp. Mot. for Remand 8-9 (citing Walker v. Ryan's Family Steak Houses, Inc., 400 F.3d 370, 381 (6th Cir. 2005).) While the Sixth Circuit has adopted the "knowing and voluntary" standard for analyzing the validity of agreements to arbitrate, that is clearly not the law in the Third Circuit, which is binding on this Court.

In Morales v. Sun Contractors, Inc., a case arising within the Virgin Islands, the Third Circuit expressly found that "[a]rbitration agreements in the employment context are not exempt from this principle." Id. at 222. In that case, the court found mutual assent to an arbitration agreement where plaintiff, a Spanish-speaking employee who could not read any of the terms of his employment agreement, had manifested his assent to the agreement by signing it. Id. at 222-23. The court noted that it was plaintiff's obligation to ensure that he understood the agreement before signing, by either asking his assigned interpreter to translate the document word-for-word or requesting to take it home and have it translated. Id. at 223. Ultimately, the court found that, absent any allegation of fraud and in light of the fact that the plaintiff had never questioned the terms of the agreement in the year that he worked for defendant, the plaintiff was bound by the arbitration provision in his employment agreement. Id.

Courts have repeatedly declined to award relief to a plaintiff who claimed not to have read or understood an agreement he or she signed. see, e.g., Foy v. Ambient Tech., Inc., No. CIV.A.08-077, 2009 WL 1766718, at *3 (D.V.I. Jun. 19, 2009) (holding that by signing employment agreement, employee manifested assent to arbitration provision despite the fact that he did not knowingly waive his right to a jury trial); Litman v. Cellco P'ship, No. CIV.A.07-4886, 2008 WL 4507573, at *7 (D.N.J. Sep. 29, 2008) (class action plaintiffs suing Verizon for administrative charges on their cell phone bills were bound by arbitration provision in their customer agreement, where they voluntarily signed agreement and did not allege fraud or misrepresentation); Williams v. Washington Mut. Bank, No. CIV.A.07-5559, 2008 WL 5427805, at *3 (D.N.J. Dec. 30, 2008) ("a mere claim of lack of awareness of the contents of a signed agreement is not sufficient to invalidate it."); Perry v. H&R Block E. Enter., Inc., No. CIV.A.04-6108, 2007 WL 954129, at *11 (E.D. Pa. Mar. 27, 2007) (holding that absent proof of fraud, a party is bound by a contract that he or she has signed but did not read); Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 101 (D.D.C. 2004) (stating that

"[f]ailing to read or understand an arbitration agreement, or an employer's failure to explain it, simply will not constitute 'special circumstances' warranting relieving an employee from compliance with the terms of an arbitration agreement that she signed"); Charles v. V.I. Serv. Co., No. CIV.A.96-085, 1999 WL 176035, at *3 (D.V.I. Feb. 16, 1999) ("[A]bsent a showing of fraud or mental incompetence, a person who signs a contract cannot avoid her obligations under it by showing that she did not read what she signed.") (quotations omitted).

Plaintiff, in this case, claims that: (1) "VIPA expressed that they urgently needed a property manager and required the signing of the Agreement to be expedited;" (2) neither the Executive Director nor VIPA's counsel reviewed the terms of the Agreement with her; and (3) VIPA did not advise her to seek counsel. (Richardson Decl. ¶¶ 5-7). Notably, however, she does not allege that she was denied any request to have counsel review the agreement, that she signed the agreement under duress, or that she was refused sufficient time to throughly review the agreement herself. Indeed, the Court observes that the Agreement is short, consisting of twelve substantive pages and one signature page. The arbitration provision is a separate paragraph unto itself and is prefaced with the heading **"ARBITRATION"** in bold and capital letters. (Agreement ¶ 17.) Plaintiff clearly manifested her assent to the Agreement by signature. She does not allege that this paragraph was hidden from her or fraudulently inserted after she signed the Agreement, nor does she claim to have ever questioned this provision during the three years prior to the commencement of her lawsuit against VIPA. Accordingly, her current argument that she either did not read or did not understand the full legal effect of this provision fails to overcome her objective expression of mutual asset. "The 'integrity of contracts demands' that this principle 'be rigidly enforced by the courts.'" Morales, 541 F.3d at 221-22 (quoting 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:19 (4th ed. 2008)).

13

### 3.    Pre-Arbitration Discovery

In a final effort to establish the invalidity of the Management Agreement, Plaintiff argues

that the Court should permit pre-arbitration discovery to prove that the parties did not enter into an

enforceable arbitration agreement.  To do so, she cites to the Third Circuit's decision in Par-Knit

Mills v. Stockbridge Fabrics Co., 636 F.2d 51, 54-55 (3d Cir. 1980) for the proposition that a

party's unequivocal denial that it agreed to arbitrate, accompanied by a supporting affidavit, creates

a genuine issue of fact requiring a jury determination of whether there in fact had been a "meeting of

the minds" as to the formation of an agreement to arbitrate.  (Pl.'s Resp. Mot. to Stay 15 (citing Par-

Knit).)  Relying on that case, Plaintiff goes on to argue that two federal district courts in the Virgin

Islands have allowed pre-arbitration discovery when presented with a factual dispute regarding the

making of the agreement.  Id.

This contention is misplaced.  In Par-Knit, the parties submitted conflicting evidence as to

whether a contract was ever intended.  Par-Knit, 636 F.2d at 54-55.  Based on that evidence, the

court found an issue as to whether the person signing the document on behalf of the plaintiff had

authority to bind the plaintiff in a contractual agreement, which included an embedded arbitration

provision.  Id. at 55.  Although the court held that the validity of the arbitration agreement in that

matter had to be decided by a jury, it set forth the express caveat that because the general policy is to

encourage arbitration of disputes, "[a] naked assertion . . . by a party to a contract that it did not

intend to be bound by the terms thereof is insufficient to place in issue 'the making of the arbitration

agreement' for the purposes of Section 4 of the Federal Arbitration Act."  Id. at 55.  Rather, there

would have to be "[a]n unequivocal denial that the agreement had been made, accompanied by

supporting affidavits."  Id.

Building upon Par-Knit's dictates, the United States District Court for the Virgin Islands, in

Pemberton v. Hovensa, L.L.C., No. CIV.A.03-124A, 2009 WL 1138086 (D.V.I. Apr. 24, 2009),

affirmed the lower court's denial of the plaintiff's request for pre-arbitration discovery to determine

whether the parties entered a valid agreement. Id. at *4. The federal court explained its reasoning

as follows:

> Limitations on formal discovery in arbitral proceeding are a conduit for efficient
> dispute resolution. To require the Superior Court to grant parties unfettered leave to
> engage in protracted pre-arbitration discovery would invariably frustrate the FAA's
> presumptive goal of arbitration as an efficient alternative to litigation. This is
> particularly the case, where as here, the party resisting arbitration has not raised any
> factual challenges to contract formation. Where no factual challenges have been
> raised, any potential litigant's discovery requests could feasibly be applied to
> arbitration provisions in all sorts of contracts. Such a requirement could result in a
> significant narrowing of the application of FAA . . . . If a narrowing of the FAA is to
> occur, it is the province of Congress, not this Court, to do so.

Id. at *5 (footnote and internal citation omitted).

Like Pemberton, and quite dissimilar to Par-Knit, this case presents a matter of little doubt as

to the validity of the parties' contractual relationship. Both Plaintiff and Defendant have produced

copies of the signed Management Agreement, which contains an unambiguous provision to

arbitrate. The validity of the Agreement and the authenticity of Plaintiff's signature on that

Agreement are undisputed. (Richardson Aff. ¶¶ 3, 9.) Plaintiff simply claims that she either did not

read or did not fully understand the contract. As explained in detail above, neither argument entitles

her to invalidate the contract. As no factual challenge as to validity has been raised, any allowance

of pre-arbitration discovery would effectively defeat the benefit and efficiency of arbitration.

The two court orders cited by Plaintiff are inapposite. First, Plaintiff references an order in

Iva Lu Martin v. The March Group, L.,L.P., et al., No. CIV.A.03-1005 (D.V.I. Nov. 2, 2006), which

permitted pre-arbitration discovery. Aside from the fact that Plaintiff does not attach a copy of this

unpublished order, Plaintiff's own description of the order undermines its relevance. According to

15

Plaintiff, the defendant in that case had produced a signed agreement and the plaintiff averred that it was not her signature, thereby prompting the court to allow pre-arbitration discovery. Quite to the contrary in this case, Plaintiff does not dispute that she manifested her assent to the Management Agreement by signing it. Similarly, in <u>Terrence Alexis v. Hovensa, L.L.C., et al.</u>, Civ. A. No. 07-091 (D.V.I. Jul. 8, 2009), the court allowed pre-arbitration discovery where the defendants had *not* submitted an agreement to arbitrate signed by plaintiff, but had produced some evidence that plaintiff agreed to apply with defendant's Dispute Resolution Program. <u>Id.</u> In the present case, however, Defendant has produced an actual Management Agreement, signed by Plaintiff, that contains an express and obvious arbitration provision.

In short, the Court declines to allow any pre-arbitration discovery. We thus reject Plaintiff's first argument and find that the arbitration provision in the Management Agreement was valid and enforceable.

**B.    Whether Plaintiff's Claims Fall Within the Scope of the Arbitration Provision**

In an alternative argument, Plaintiff contends that her claims are not encompassed by the arbitration provision. As noted above, the Management Agreement states, in pertinent part, "[e]xcept for a claim for equitable relief, any controversy, dispute or claim arising out of or relating to this Agreement, or its interpretation, application, implementation, breach or enforcement which the parties are unable to resolve by mutual agreement, shall be settled by submission by either party of the controversy, claim or dispute to binding arbitration . . . ." (Agreement ¶ 17.) Plaintiff now asserts that neither her employment discrimination nor her tort claims fall within the scope of this provision. The Court disagrees.

It is well-established that, "the parties might agree to the resolution of some but less than all of their disputes arising out of a particular contract or relationship through arbitration . . . and thus

even if a court finds that the parties have agreed to arbitrate *some* disputes it must find, to order arbitration, that the parties have agreed to arbitrate the dispute in issue." Century Indem., 584 F.3d at 523. "Inasmuch as 'federal law applies to the interpretation of arbitration agreements,' once a court has found that there is a valid agreement to arbitrate, regardless of whether the action is in a federal or a state court, the determination of whether a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law." Id. at 524 (quotations omitted). The "federal substantive law of arbitrability," directs that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)); see also Sharon Steel Corp. v. Jewell Coal & Coke Co., 735 F.2d 775, 778 (3d Cir. 1984) (noting the strong presumption in favor of arbitrability). Contractual authority to arbitrate a given claim exists if the facts at the heart of the claim "touch matters" covered by the terms of a valid arbitration agreement. See Brayman Constr. Corp. v. Home Ins. Co., 319 F.3d 622, 626 (3d Cir. 2003). The court must focus on the factual underpinnings of the complaint rather than the legal theories or labels given to the causes of action asserted. Varallo v. Elkins Park Hosp., 63 Fed. Appx. 601, 603 (3d Cir. 2003). The Third Circuit has noted that "when phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction, and are generally construed to encompass claims going to the formation of the underlying agreements." Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000). "This construction of an arbitration provision is consistent with . . . federal . . . precedent holding that an agreement to arbitrate a particular dispute 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Id. (quoting AT&T Tech., 475 U.S. at 650); see also Medtronic AVE Inc. v Cordis Corp., 100 Fed. Appx. 865, 868-69 (3d Cir. 2004).

17

The United States Supreme Court, in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), directly addressed whether discrimination claims fell within the ambit of a broadly worded arbitration clause. It held that an arbitration agreement providing for binding arbitration of "any controversy . . . arising out of the employment or termination of employment" included discrimination claims under the Age Discrimination in Employment Act. Id. at 23, 32. Although the arbitration clause did not specifically state that statutory claims were encompassed by its language, the Supreme Court remarked that "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." Id. at 26.

In the wake of Gilmer, numerous courts have extended its holding to find that a broadly worded arbitration clause governs disputes beyond those involving the terms of the contract, including discrimination claims. See, e.g., Seus, 146 F.3d at 182 (extending Gilmer's holding to claims under Title VII and holding that "we find Title VII entirely compatible with applying the FAA to agreements to arbitrate Title VII claims); Gillespie v. Colonial Life & Acc. Ins. Co., No. CIV.A.08-689, 2009 WL 890579, at *8 (W.D. Pa. Mar. 30, 2009) (finding that broadly worded arbitration clause encompassed claims of sexual harassment and retaliation under Title VII and the PHRA, breach of contract, battery-negligent entrustment, and battery-vicarious liability); Hearon v. AstraZeneca LP, No. CIV.A.02-3189, 2003 WL 21250640, at *5-7 (E.D. Pa. May 24, 2003) (finding that broadly worded arbitration clause in employment contract governed plaintiff's claims of breach of contract and knowing, reckless, and willful violation of her rights under Title VII and the PHRA); Poole v. L.S. Holding, Inc., No. CIV.A.01-57, 2001 WL 1223748, at *2-3 (D.V.I. Aug. 20, 2001) (finding that arbitration clause in employment agreement encompassed plaintiff's claims of employment discrimination); Charles, 1999 WL 176035, at *3 (holding that arbitration provision in employment contract covered claims of age discrimination under the ADEA and racial and religious discrimination under Title VII).

18

Although not argued by either party, it is equally well-established that where separate tort claims arise out of the same facts as clearly arbitrable claims, a broadly worded arbitration provision embodies such claims. See CD Partners, LLC v. Grizzle, 424 F.3d 795, 800 (8th Cir. 2005) ("Broadly worded arbitration clauses . . . are generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement); P&P Indus. v. Sutter Corp., 179 F.3d 861, 871-872 (10th Cir. 1999) (arbitration clause which provided that "[a]ny controversy, claim, or breach arising out of or relating to this Agreement" shall be arbitrable, was broad enough to encompass tort claims where the tort allegations were closely connected to breach of contract action); Nova CTI Caribbean v. Edwards, No. CIV.A.03-5319, 2004 WL 35759, at *4 (E.D. Pa. Jan. 8, 2004) (holding that because plaintiff's tortious interference with contractual relations claim was directly related to the claim that defendant breached the Agreement by resigning from plaintiff and forming an employment relationship with another company, the tort claim fell into the scope of the arbitration provision).[6]

In the present case, the focus of the overarching dispute is Defendant's ratification of Martin's sexually harassing and hostile behavior toward Plaintiff. The breadth of the language of the arbitration clause – "any controversy, dispute or claim arising out of or relating to this Agreement, or its interpretation, application, implementation, breach or enforcement" – establishes that it was intended to apply to any claim, controversy or dispute related to Plaintiff's employment relationship with Defendant and was not limited to disputes relating to a specific provision of the Agreement. Under the clear holding of Gilmer, Plaintiff's allegations of discrimination and breach of contract are thus encompassed by the arbitration clause. In addition, Plaintiff's state tort claim of

---

[6] While the Third Circuit does not appear to have expressly opined on this issue, other courts have found tort claims to be arbitrable where interwoven with the clearly arbitrable claims. Sarl v. A.M. Todd Co., No. CIV.A.07-2727, 2008 WL 724607, at *12 (E.D. Pa. Mar. 18, 2008) (citing cases).

intentional infliction of emotional distress is inextricably intertwined with her discrimination and breach of contract claims, as it arises from Defendant's allegedly wrongful treatment of Plaintiff during the course of her employment. See Stanton v. Prudential Life Ins. Co., No. CIV.A.98-4989, 1999 WL 236603, at *5 (E.D. Pa. Apr. 20, 1999) (noting that state tort claim of intentional infliction of emotional distress was arbitrable since it arose directly from the circumstances leading to plaintiff's termination from employment).

The sole claim that causes the Court any hesitation is Plaintiff's allegation of assault and battery, which presumably stems from the December 19, 2008 incident when Martin threatened to "knock that child" out of Plaintiff and then proceeded to hit her in the side. (Compl. ¶¶ 49, 74.) While, at first blush, that claim does not appear to "arise out of" Plaintiff's employment relationship with Defendant, a closer look at applicable jurisprudence suggests otherwise. In Chase v. Virgin Islands Port Auth., 3 F. Supp. 2d 641 (D.V.I. 1998), the court determined that, based on Restatement (Second) of Agency §§ 219.1 and 228.1, an employer is liable for an employee's intentional tort only if: (1) the employee's tort encompassed the type of action the employee was hired to perform; (2) the employee's tort occurred within prescribed limits of time and space; (3) the employee's tort purposefully served the employer; and (4) in the case of intentional force, such force was expected by the employer. Id. at 642-43; see also Bell v. Univ. of V.I., No. CIV.A.00-62, 2003 WL 23517144, at *3 (D.V.I. Nov. 19, 2003). Under these elements, adjudication of Plaintiff's assault and battery claim requires consideration of the scope of VIPA's knowledge with respect to Martin's actions, which is the precise issue before the arbitrator in connection with the discrimination claims. Hence, the claim of assault and battery arises directly from the circumstances involving Plaintiff's employment and clearly falls within the bounds of the arbitrable dispute.

As explained above, federal law favors arbitration and all doubts are to be resolved in favor

20

of arbitration. This presumption is assumed "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Century Indem., 584 F.3d at 524. The language of the arbitration clause in this matter is undoubtedly susceptible to an interpretation that claims of sexual harassment and related torts are included within the scope of the provision. Applying the presumption, the Court thus holds that the entirety of Plaintiff's Complaint is encompassed by the arbitration provision.

### C.    Whether the Arbitration Provision Is Unconscionable

In her third argument, Plaintiff contends that the arbitration provision is both procedurally and substantively unconscionable. Under the local law of the Virgin Islands, a court may refuse to enforce a contract or term of a contract that is unconscionable at the time the contract is made. Edwards v. Hovensa, 497 F.3d 355, 362 (3d Cir. 2007) (citing RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981)). Unconscionability includes both procedural and substantive elements and both must be proven to revoke a contract on that basis. Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 265 (3d Cir. 2003) (considering unconscionability challenge to arbitration provision under Virgin Islands law); see also Hall v. Treasure Bay Virgin Corp., No. CIV.A.05-170, 2009 WL 689626, at *1 (D.V.I. Mar. 9, 2009), aff'd No. CIV.A.09-1754, 2010 WL 926004 (3d Cir. Mar. 16, 2010). "When the party with greater bargaining power prepares the contract and presents it on a take-it-or-leave-it basis, the agreement is termed a procedurally unconscionable contract of adhesion." Cannonier, 2010 WL 697351, at *3-4. However, a contract is "not unconscionable merely because the parties to it are unequal in bargaining position." Alexander, 341 F.3d at 265 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 208 cmt. d). Rather, "[t]he party challenging the contract . . . must also establish 'substantive unconscionability.'" Cannonier, 2010 WL 697351, at *2 (quotations omitted). This occurs when the dominant party uses its position to impose "terms

21

that unreasonably favor one party to which the disfavored party does not truly assent." Alexander, 341 F.3d at 265. The Third Circuit has held that an arbitration clause is generally not unconscionable, even in a contract of adhesion, because plaintiffs who sign valid arbitration agreements retain the full range of substantive rights. Gay, 511 F.3d at 391-92. As such, "the burden of proving such unconscionability lies with the party challenging the contract provision." Parilla v. IAP Worldwide Servs., V.I., Inc., 368 F.3d 269, 277 (3d Cir. 2004).

Applying these standards to the instant matter, Plaintiff first argues that the agreement to arbitrate is procedurally unconscionable because the overarching Management Agreement was a "contract of adhesion." More specifically, she claims that Defendant required her to sign the Management Agreement without the opportunity to negotiate the terms of any purported agreement to arbitrate, without being advised to have counsel review the Agreement, without explanation of its terms, under an expedited review process, and on a "take it or leave it basis." (Pl.'s Resp. Mot. to Stay 11.)

The Court notes, however, that Plaintiff is not an uneducated individual, but rather was hired as the Property Manager of a large, 60,000 square foot commercial and retail facility at an annual salary of $125,000. (Compl. ¶ 3; Management Agreement ¶ 3(a).) Although no one at VIPA reviewed the terms of the Agreement with her or advised her to seek legal assistance, Plaintiff never alleges in her Affidavit that she was forbidden from consulting counsel or from negotiating the terms of the Agreement. See Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 229 (3d Cir. 2009) (holding that an arbitration clause in an employment contract between a trading/investment firm and a hedge fund manager was not procedurally unconscionable because the manager "was a highly-educated party with various employment opportunities," and the manager "d[id] not allege that he was denied an opportunity to negotiate the contract before accepting [ the] offer"); but cf

22

Nino v. Jewelry Exchange, Inc., No. CIV.A.06-039, 2008 WL 5424071, at *3 (D.V.I. Dec. 29, 2008) (finding procedural unconscionability where record showed that terms of employment contract, including arbitration agreement, were not subject to negotiation, that preparer of contract was corporation doing international business, and that plaintiff's immigration status was dependant on his accepting the job offer and, in turn, the arbitration agreement).

Nonetheless, the record reveals that the Management Agreement was prepared solely by Defendant as part of Plaintiff's employment contract and that Defendant VIPA is a semi-autonomous agency of the Virgin Islands, arguably giving Defendant substantially more bargaining power over Plaintiff as an individual. (Compl. ¶ 3.) Under Virgin Islands law, a court "may find a contract of adhesion when an employee argues through counsel, as [plaintiff] has done in this case, that the employee had the choice of either signing the arbitration agreement or foregoing employment, and that the employee was not allowed to make any modifications to the arbitration clauses." Reed v. Turner St. Croix Maint., Inc., No. CIV.A.03-095, 2005 WL 1074383, at *3 (D.V.I. Mar. 28, 2005) (rejecting absolute requirement of an affidavit from employee regarding procedural unconscionability). Giving Plaintiff the benefit of the doubt, the Court will assume – solely for the sake of this Motion – that the Management Agreement is procedurally unconscionable.[7]

Accordingly, to prevail on her argument, Plaintiff must now demonstrate substantive unconscionability. To prove this element, Plaintiff points to two different aspects of the Agreement, which are purportedly "one-sided." (Pl.'s Resp. Mot. to Stay 12.) First, she contends that the

---

[7] Defendant attaches as an exhibit to its Reply Brief a copy of the opinion in the case of Nobles v. Bechtel, Civ. A. No. 2003-111 (D.V.I. May 9, 2006), wherein the court declined to find a similar arbitration agreement unconscionable. While this Court agrees that that opinion casts doubt on any finding of procedurally unconscionability in this case, the Court is hesitant to rely on it, given that it is not published in any text or electronic database of which this Court is aware.

Agreement required her to waive her fundamental right to a civil jury trial while not simultaneously requiring VIPA to arbitrate claims that it would most likely have against the employee. She explains that, "[t]here is no arbitration provision relating to claims by VIPA against Plaintiff for breach of contract, fraud, theft, misappropriation of trade secrets, or non-competition claims that might arise under the Agreement." (Id.) Thus, "[t]he calculated language of the Agreement specifically provides for VIPA to bring these kinds of claims against Plaintiff in a court of law," thereby making it unreasonably favorable to VIPA. (Id.)

This argument finds absolutely no substantive basis within the plain language of the Management Agreement. As indicated above, the arbitration provision states that "[e]xcept for a claim for equitable relief, *any controversy, dispute or claim arising out of or relating to this Agreement, or its interpretation, application, implementation, breach or enforcement which the parties are unable to resolve by mutual agreement*, shall be settled by submission *by either party of the controversy, claim or dispute* to binding arbitration . . ." (Agreement ¶ 17.) Nothing in the Agreement even remotely suggests that the arbitration provision is less applicable to VIPA than to Plaintiff. Indeed, by its express terms, the Agreement requires "any controversy, dispute or claim" arising out of the Agreement – except for one seeking equitable relief – to be referred to arbitration, without any restriction to which party brings the dispute.[8] (Agreement ¶¶ 8, 17.)

Second, Plaintiff claims that the Management Agreement is unconscionable "because it purports to bind Plaintiff based upon a promise of continued at-will employment, which really is an

---

[8] Notably, the Third Circuit has held that under federal substantive law, "parties to an arbitration agreement need not equally bind each other with respect to an arbitration agreement if they have provided each other with consideration beyond the promise to arbitrate." Harris, 183 F.3d at 180; see also Gutman v. Baldwin Corp., No. CIV.A.02-7971, 2002 WL 32107938, at *5 (E.D. Pa. Nov. 22, 2002) ("A contract need not have mutuality of obligation as long as the contract is supported by consideration.").

illusory promise because VIPA can terminate the employee at any time with or without cause."
(Pl.'s Resp. Mot. to Stay 12.) She contends that because VIPA unilaterally retained the right to
terminate the Management Agreement, there was no consideration sufficient to support the
arbitration clause.

Again, this argument is misplaced. It remains well-settled that consideration is required for
an enforceable contract and its absence may be a ground for revocation. Shervington v. Gallows
Bay Hardware, Inc., No. CIV.A.03-165, 2009 WL 1650414, at *1 (D.V.I. Jun. 11, 2009).
"Consideration confers a benefit on the promisor or a detriment on the promisee, and must be an act,
forbearance or promise in exchange for the original promise." Channel Home Ctrs. v. Grossman,
795 F.2d 291, 299 (3d Cir. 1986) (internal quotations omitted). In the context of arbitration
provisions, the Third Circuit has expressly held that "[w]hen both parties have agreed to be bound
by arbitration, adequate consideration exists and the arbitration agreement should be enforced."
Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002); see also Century Indem Co., 584
F.3d at 535 (reaffirming Blair); Marotta v. Toll Bros., Inc., No. CIV.A.09-2328, 2010 WL 744174,
at *4 (E.D. Pa. Mar. 3, 2010) (finding adequate consideration where both plaintiff and defendant
agreed to be legally bound by the arbitration agreement for all disputes arising out of plaintiff's
employment); Plaskett v. Bechtel Int'l, Inc., 243 F. Supp. 2d 334, 339 (D.V.I. 2003). ("[t]he
arbitration provisions provide consideration for the Agreement, in that both parties agreed to be
bound by arbitration.").[9]

---

[9] Plaintiff's citation to the Missouri case of Morrow v. Hallmark, 273 S.W.3d 15 (Mo. App.
2008) is completely distinguishable from this case. The contract in that matter did not involve a
mutual agreement to arbitrate. Id. at 18. Rather, the employment contract was simply a
condition to employment-at-will, had a lack of mutual promises to submit claims to arbitration,
and was supported by no other recognizable consideration. Id.

As set forth above, both parties unequivocally agreed to be legally bound by the arbitration provision and to submit to arbitration all disputes arising out of Plaintiff's employment relationship with Defendant. Well-settled Third Circuit law establishes that this mutuality of promises suffices for adequate consideration for the Management Agreement. Thus, the Court rejects this portion of Plaintiff's argument and declines to void the arbitration provision on grounds of unconscionability

**D.** **Whether Defendant's Treatment of Plaintiff Effectively Revoked the Agreement to Arbitrate**

Plaintiff's final effort to avoid the legal effect of the arbitration provision of the Management Agreement contends that by treating Plaintiff as a "Regular VIPA Employee," Defendant revoked the arbitration clause. (Pl.'s Resp. Mot. to Stay 13.) She explains this argument as follows:

> [A]lthough the Agreement provides for Plaintiff to receive semi-annual performance evaluations and annual pay raises based on the reviews with a minimum of 5% increase, VIPA has NEVER conducted a performance evaluation of Plaintiff and has refused to giver her a salary increase for three and a half (3 ½) consecutive years from 2007 until February 2010 . . . . This evidences VIP[A]'s revocation of the Agreement in its most essential form. . . . VIPA also breached the Agreement by giving Plaintiff duties that exceeded the scope of the Agreement . . . . Moreover, VIPA required Plaintiff to turn in time sheets and attendance reports of her time spent as Property Manager although that was not within the scope of the Agreement . . . . VIPA demanded that Plaintiff request approval for vacation leave, although the Agreement specifically states that Plaintiff can take vacation leave at her discretion with notice to VIPA . . . . Consequently, these numerous instances of VIPA's revocation of the Agreement renders the agreement null and void. Plaintiff was treated as a regular VIPA employee, not subject to the Agreement.

(Pl.'s Resp. Mot. to Stay 13-14 (internal citations omitted).)

This argument finds no legal support. The FAA, as indicated above, establishes a strong presumption in favor of compelling arbitration over litigation. Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104 (3d Cir. 2000). Therefore, to determine the enforceability of an arbitration clause, the FAA requires the court conceptually to sever the arbitration provisions from the remainder of the

contract and analyze the arbitration clause as an individual agreement executed concurrently with the encompassing contract. Id. at 106. "Attacks must relate specifically to an arbitration provision and not to the validity of an agreement incorporating arbitration provisions." Plaskett, 243 F. Supp.2d at 339 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967)). Thus, even where the validity of the contract is in dispute, the statute mandates that courts reserve these issues for the arbitrator. Sandvik, 220 F.3d at 105; see also Harris, 183 F.3d at 179 ("If a court deems a controverted arbitration clause a valid and enforceable agreement, it must refer questions regarding the enforceability of the terms of the underlying contract to an arbitrator pursuant to section four of the FAA."). In other words, a mere finding that a contract is voidable, be it for breach or otherwise, does not render the arbitration clause unenforceable; rather the court must find that the arbitration clause itself is unenforceable.[10] Prima Paint, 388 U.S. at 403-04.

In the present matter, Plaintiff sets forth no basis, other than those discussed above, for non-enforceability or revocation of the arbitration clause. She simply alleges that Defendant has breached several substantive portions of the Management Agreement. Pursuant to the plain language of the arbitration provision, Plaintiff may bring these breach of contract claims before the arbitrator. It then falls within the province of the arbitrator to determine, under state law, whether the alleged breaches allow Plaintiff to revoke the remainder of the Agreement. Under the principle of severability, however, such breaches do not allow Plaintiff to escape her obligation to arbitrate.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court finds that the parties clearly and unequivocally agreed to arbitrate all of the claims raised by Plaintiff in her present Complaint. The Management

---

[10] While a finding that a contract is void *ab initio* – *i.e.*, was not a contract at all – can render an embedded arbitration provision unenforceable, Plaintiff does not dispute that she entered into a valid Management Agreement. See Sandvik, 220 F.3d at 107-09.

Agreement constituted a valid, enforceable meeting of the minds and Plaintiff has failed to establish

unconscionability or any other contractual defense that would entitle her to void the Agreement.

In such cases, section 3 of the FAA provides that:

> [i]f any suit or proceeding be brought in any of the courts of the United States upon
> any issue referable to arbitration under an agreement in writing for such arbitration,
> the court in which such suit is pending, upon being satisfied that the issue involved in
> such suit or proceeding is referable to arbitration under such an agreement, shall on
> application of one of the parties stay the trial of the action until such arbitration has
> been had in accordance with the terms of the agreement, providing the applicant for
> the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. For arbitrable issues, a section 3 stay is mandatory. Shearson/Am. Express, Inc. v.

McMahon, 482 U.S. 220, 226 (1987) ("[A] court must stay its proceedings if it is satisfied that an

issue before it is arbitrable under [an] agreement . . . ."). The Third Circuit has held that even where

all of the claims are subject to arbitration the plain language of 9 U.S.C. § 3 "affords a district court

no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."

Lloyd v. Hovensa, LLC., 369 F.3d 263, 269 (3d Cir. 2004).

Defendant, in this case, requests a stay. Pursuant to the FAA, the Court will therefore stay

this case pending the conclusion of arbitration.

An appropriate order follows.